P.O.: Zero-E1069, Henry Lane, add on. Mr. Manuel. Good morning, Your Honor. Edward Manzo for the appellant, Michael Prezov. I've been to this court about 14 or 15 times in my 33 years of practice. This is the first time I'm here on an appeal from the Patent Office. The product in question, or the patent in question, covers connectors on rope light. This is rope light. When you buy it in a hardware store or Home Depot, it comes typically in a box like this. This one happens to be a Sunbeam brand. Mike Klein is the licensee that makes the Sunbeam brand.  However, what is in the record is the original blister pack, and you can see that in the appendix at page A550. In both cases, you will see that the consumer is told how to use these molded connectors that Mr. Prezov put on the end of these rope lights. Now, I have to confess that this is not terribly legible, but this is the best we could find after so many years. By the way, the patent issued in 1992. We are now approaching six years of reexamination. It was, I think, in the summertime of 2002 that the first reexamination was entered. A lot of your case turns on the secondary considerations. I want to talk about those a lot today. Well, but do we reach them? When you have a prima facie case of a rather simple connector, and there is prior art that makes similar connections, do we reach the secondary considerations at all, or does the prima facie case dispose of this non-obviousness? That's a good question, Your Honor. I don't believe that under the precedent of this court, that's a legitimate question. To the contrary, you've said very often that you don't reach the secondary, that the secondary considerations do not trump the failure to achieve a prima facie, to rebut a prima facie case of obviousness. That may be true, Your Honor, but N. Ray Reinhart, for example, says very clearly that if there's a prima facie case made by the examiner or anyone else, and then you come forward with secondary considerations, the prima facie presumption vanishes, and you have to weigh the secondary considerations against all the primary evidence at the same time en route. And it says very clearly here in N. Ray Reinhart, page 1052, prima facie obviousness is a legal conclusion, not a fact. Facts established by rebuttal evidence must be evaluated along with the facts in which the earlier conclusion was reached. But their rebuttal evidence, if we don't make it to the rebuttals phase, if the prima facie case stands, do you have difficulty bringing your rebuttal evidence at all? I don't think I understand, Your Honor. Well, I'm saying if this court determines that there's a prima facie case of obviousness, what consideration do we have to give to your secondary considerations, which seem very strong? I don't think you're allowed to omit consideration of the secondary considerations. The Supreme Court has said that. And this court has said that in several precedents. You do not consider the primary evidence and then weigh them against the secondary considerations to see whether one outweighs the other. You have to look at them all at the same time. And that's what this court explained, not only in Reinhart, but also in the Simmons-Basseter case, and I think in the Ashenberg case, and many other cases, the Gore v. Garlock case. You have to, once secondary considerations are shown, or the rebuttal evidence, as we have a right to introduce, you must, the court must, any tribunal must, including the PTO, consider anew, start over, and look at the evidence in light of all the evidence, including the secondary considerations. It's not proper to say, well, we think it's obvious, and therefore, we're going to consider whether the secondary considerations outweigh our tentative conclusion that the prior art shows this. Now, we disagree very strongly on the showings of the prior art. The main reference, Chin, was the primary reference in the original examination. Chin, the solicitor and I agree that Chin is hardly a model of clarity. Solicitor Chin, by the way. Solicitor Chin, my apologies. We both agree that the Chin reference is not a model of clarity. And one point that I would point out about But at one point in Chin, in the first column, lines 19 through 21, it specifically says many lamp springs can be connected in a series. Yes, it says that, Your Honor. We treated that very carefully in the brief. This patent to Chin distinguishes between a lamp spring device and a lamp spring set. The lamp spring sets are shown for The only real distinction from the prior art is that you have a pre-molded unitary connector, right? Why is it that kind of obvious that you could If you're going to connect springs of lights, that you could make it into a molded unitary connector? Well, Your Honor, I would first say that there were eight years between Chin and Tassoui and Prezov, and yet nobody came along and did that. And second, when Mr. Prezov did make that combination, the market erupted. It was volcanic. The secondary considerations here are utterly explosive. The sales without the invention went from zero to 100 percent. He completely drove out all other uses. He also was responsible for underwriter's lamps resulting in a standard change in 2003. How long was the marketplace exploding before that standard? The market exploded upon the introduction of his product in 2000. In 2000, the industry completely abandoned and started copying. Nothing else was sold. The kind of rope light that you would see on a tall building is a commercial installation. Which of the secondary considerations is the standard? This would be in the nature of an industry award. But this court commented on an industry standard in the In re Hayes microcomputer case. The secondary considerations that are relevant here It's kind of like licensing. It's kind of like Wong felt need. It's kind of like a lot of the copying. It invokes several of the secondary considerations, doesn't it? It does, Your Honor. And it would seem to me that when an invention is so low that underwriter's lamp says We won't approve a rope light in the United States unless it conforms to this configuration. Because the rest of them are hazardous. This is enormously significant. Now, I have to note with sincere chagrin that during the reexamination process, the patent office examiners totally ignored the secondary consideration documents. And I think I brought out in my briefs that I was standing on my head, screaming and yelling about the secondary considerations. And it appears in captions of my brief, I had pages and pages of secondary consideration discussion in my brief for the examiner. And the first time that the examiner commented on it is after I filed my reply brief before the board. And then what happened, this shows you that the examiner did not follow the law. Did you draw a proper nexus between all of these secondary considerations and the claimed invention? I believe that I did. The criticism that I did not, did not arise until after I couldn't do anything about it. The board returned the case. But in an ex parte proceeding, this was ex parte, wasn't it? This is an ex parte reexamination. So even though it's in an ex parte, you're going to have to make that showing kind of at the outset, aren't you? The nexus showing? Yes, it is. And I think we did. I think that we showed that there were sales. We established the law in our briefs that showed when there are sales of the invention, there's a presumption of nexus. But there's also direct testimony of nexus. There are two declarations by Mr. Prezov himself. And those are in the appendix. And that explains very carefully what was copied by all the others, what his product was that was commercially successful, how sales went from zero to $250 million in the space of three short years. And by the way, I want to make a point. The board said copying is irrelevant here because it shows that the industry disrespected the patent. And this is impossible on these facts because Mr. Prezov's product Well, if you do believe the patent to be invalid, you'd be justified in copying it, wouldn't you? Yes, but if I may explain, Judge, the Prezov product came to market in 2000. The patent didn't come out until 2002. People copied it in 2000 right away. There was no patent around for them to disrespect when they decided they were going to go forward willy-nilly. So the facts don't apply to the argument. The argument finds no response to facts. There are other clear errors by the panel below. If I am into my rebuttal time, I would prefer to save that for later. You are. Thank you, Your Honor. Thank you, Your Honor. May it please the Court. Excuse me for interrupting, but why did it take six years on a relatively simple technology to resolve this ex parte reexamination? Well, I think when you look through the prosecution history, you'll realize that there were three different reexamination requests done on this patent. Two by separate parties and one by Mr. Prezov himself. So, first of all, just to get the reexam up to speed, all of those had to be evaluated and then they were ultimately all ordered based on respective prior art references. And then they had to be merged before going forward. And then after that... Does that take six years? It doesn't take six years, but that's one part of the reason why it took a while. Then beyond that, there were multiple office actions here There were, I believe, three different office actions. There was an advisory action, there was lots of briefing to the board, and then the police did it themselves. Just as a side comment, the reexam program has been very criticized as just a way to delay litigation and kind of a last ditch effort to avoid the consequences of litigation. When you have a lengthy delay like this, that kind of adds fuel to that fire, doesn't it? And the PTO has been well aware of wanting to make reexams go as quickly as possible, which is why just a few years ago, the PTO decided to consolidate all of its reexams to be conducted by one special unit. And so now, the PTO has been doing a much better job of being attentive to these proceedings and making sure that they go with special dispatch. And in fact, it's been doing so well, one of the consequences is perhaps getting too popular, and now our wonderful cracked unit of reexam examiners is getting overwhelmed by even more and more reexam requests. But that's something we'll have to deal with later. But excuse me for interrupting. Not at all. Getting back to this case, I think the PTO does agree that the appeal really boils down to whether or not this secondary consideration of these two declarations really are sufficient to triumph over all of the primary considerations for why these claims are obvious. Before you get into the secondary considerations, of course, the first thing we have to establish is whether there is a crime-of-patient response. I want you to focus, if you would, on the Chinn reference, and in particular on the two sections of Chinn, I think column one and column two, which I guess are the only columns of Chinn. Essentially, yes. In which there's a reference that the board took to be at least a suggestion of multiple units of lamp strings. The one is, I think you referred to them in your brief, the one is at column one, lines 18 through 21, and the other is column two, lines 29 through 35. Now, your opposing counsel said, well, that really is not a discussion of separate units that would be connected together as in the claimed device, but rather simply a discussion of the use of multiple lamp strings, that is to say multiple strands of connected light bulbs, which Chinn discloses can be used, for example, along the circumference of the tube that is used for display. Now, do you read these two references to establish, at least with some degree of clarity, that this is a suggestion for separate units as opposed to simply multiple lamp strings in the same unit? Sure. I think what the board and the examiner did was they looked at column one, lines 18 through 21, which you both cited, and also the figure three of Chinn, and what they came down to, what the board said was, okay, we know that lamp strings can be connected in series, and that is plainly stated in the background section, sort of like a well-known established practice. And now what does that mean? What would one of ordinary skill in the art take that term to mean? And the board said it would know that you could connect in series lamp strings through the male-female connectors that are shown in figure three. Well, you could, but is there anything in Chinn that suggests the connection of lamp strings through some such connector as opposed to simply connecting the lamp strings and turning, let's say, a six-foot tube into a 12-foot tube by wiring the two lengths of lamp string together in the middle of the tube? Well, I don't think there's anything explicit about that in here, but we do know that lamp strings can be a string of bulbs, and then it talks about how those can be connected in series. Well, it doesn't explain how that would be connected in series. Would you be soldering wires together inside to make a bulb? Prokof says that that's exactly what you were doing. You were cutting the rope at the point where you wished your link to be and adding attachments by hand, and that he facilitated the interconnection. The problem is, with this short reference, we don't have that explanation. What we have here is this notion that you can connect these things in series, and we have Figure 3, which shows a rope light with a three-pin male connector on one end and a three-socket female connector on the other. And so then the question becomes, well, how would one of ordinary skill in the art read this entire reference together? Figure 3 doesn't show you connecting two separate chains of rope. It shows you connecting one chain to a power source and plugging the other end. Right. And I think the point to be made there is, why is there this end cap plug on the end to connect to the VR connector? What I understand that you're making is that Figure 3 wouldn't have this additional mechanism on the end, the end cap plus a screw to attach the end cap, unless something other than simply a circuit completion device were contemplated. You know, it's all you'd have. You'd just have the end with the wire going around like that, and you wouldn't have an end cap. You'd just seal it off. And just seal it off. Cheaper, easier, less complicated. And this must contemplate some things to attach to it. Exactly. Is that the question? Yes. And the fact that, just looking at this figure, we see three pins on one end, a male connector, and then three sockets on the other end, and the fact that it was already well known in the art, just look at a reference like Lin, which predates Chen, that shows the notion of connecting end-to-end lots of rope lights together using electrical and mechanical connections. And then it becomes clear that one of ordinary skill in the art, reading this reference, would understand that you could connect these rope lights in series, based on a combination of the specification, as well as just the... Given that there's some ambiguity, nonetheless, what consideration did you give to the rather strong secondary considerations? Long-felt need, industry awards, market domination. Well, the board carefully evaluated all the evidence, which were those two declarations, plus whatever supporting documents there were. First of all, with respect to the asserted copying, which, by the way, is undocumented in the record, but going to the copying issue, the board was correct in saying that copying by itself is a form of equivocal evidence. This court has said that before, and the board cited Cable Electric. Why is it equivocal in this case, where there's no patent until two years after the copying? It's equivocal because copying could simply be evidence of the fact that other people found this particular device to be painfully obvious, and therefore wouldn't really consider that it would merit patent protection. And I think that's the reasoning behind why copying by itself isn't exactly embraced as to try and... If it's painfully obvious, why the at least six or seven-year delay between Chen and Crosso? Well, that we don't know. We know that Chen already taught us a rope light with a molded male connector on one end and a molded female connector on the other. And yet the marketplace hadn't adopted the Prozov invention until he put it in the marketplace. That's true, but the fact that the matter... I assume the fact that that's true, a pretty powerful fact. Because the fact that something is popular doesn't mean that it automatically merits patent protection. The fact that there are these elements out there that existed in the prior art, you cannot rely on those elements in the prior art to justify patentability for your claimed invention. What do you mean by your statement that copying was not documented in the prior art? Well, I guess what I meant by that was we saw statements in the declarations on Mr. Prozov that substantially all other manufacturers was also using his claimed connectors. But we don't see any product numbers or names of the competitors or where they are selling it or just exactly how their claimed connectors or how their connectors look exactly like or match his claimed connectors. So... Why are we spending so much time talking about copying instead of wearing? Well, I think the board already said that the copying evidence in this particular case was equivocal. And so that... Right. But what really also drives this case is the nexus question. And I think what happened here was Mr. Prozov was, as you can read in his blue brief, was mistaken in believing that as long as he could show that there was some commercial success of this overall rope-like product, which embodied his little claimed connectors on the ends, if he could show that, then that's enough of a presumption of nexus. And then the burden would shift to the PTO to somehow discredit that presumed nexus. Well, that's not the case, because in Ray Huang, it's very clear that before the PTO and PTO proceedings, someone like Mr. Prozov must show hard evidence that there is a nexus between the unique characteristics of his claimed invention and the actual sales. In other words, were those sales being caused? Was there a causation chain between those sales and the unique characteristics of his claims? Now we have to look at what are those unique characteristics. It's not molded connectors on the ends of those rope-likes. You can just look at A58 and see Chen has them. What did Mr. Prozov invent? It wasn't electrical male-female connectors. It wasn't mechanically coupling those two connectors with threading. That was already known in the art. Did the procedure here prejudice Mr. Prozov? The examiner didn't give any consideration to the secondary considerations until the record was closed and it goes up to the board. And he's arguing prima facie case the entire time with the examiner. And then when the shift comes, it's too late for him to supplement the record. Is that a problem? No, it's not a problem here, Your Honor, because that would have been a petitionable matter for Mr. Prozov. If he felt like there was some kind of procedural error by the examiner in being tardy in responding to his secondary consideration evidence, and also the board pointed this out, it was incumbent upon Mr. Prozov to try to petition to reopen prosecution. If he felt like he had, oh, now he has better evidence, now he understands the law, maybe let me try to supplement the record with new and improved evidence. He's never suggested in any of his briefs that he has extra, better evidence sitting on the sidelines and he was frustrated by the inability to supplement the record. He never petitioned for that. And petitionable matters, I just want to add, is not something that's reviewed either by the board or this court. The board points that out. This is not a case like last year's in Ray Sullivan, where the board just blew off the declarations and failed to consider the declaration. And it's here, the board amply considered it. Mr. Prozov had the opportunity to respond to the examiner's supplemental answer in criticizing his evidence, and so that's why the board correctly found there wasn't due process consideration here in this case. So unless there's any questions, thank you. First, as I read the Board of Appeals opinion, they did not challenge copying. It's only the solicitor who's challenging copying. The evidence is in there. Mr. Prozov's declarations state very carefully what he wanted to copy. He said what is in all products that are on the market. He went down element by element and said they're all there. The board never challenged that. The board just said, well, copying is equivocal evidence at best. Second, looking at Chen, if you look in the record in the appendix at page A19, you'll see the table that the Patent Office used where they assigned part numbers to these drawings. And if you look, you'll see that the Patent Office says the first numberhead portion is 505. Now, turning back a page, and the figure is on A18, the table's on A19. If you go back to look at the claim itself on page A17, you'll see that the head portion and the first number tail portion, according to the claim, must be formed as a single unitary structure. Now, if that is so, and of course that's what the claim requires, how in the world could 505 possibly rotate and have screw threads in it so that it would draw in this mysterious cap, this mysterious plug? That's inexplicable. And I made plenty of technical arguments before the examiner, and they are in the briefs, in the appendix, saying, look, I don't think those look right. When you look in 505, you don't see any screw threads. When you look at 506, I see little rings, and it seems to me that those could be just compression rings. And you push this plug into the end. But if 505 is supposed to be the head portion, then it's static. It does not move. Second, the solicitor just told you that Chen is molded. I don't know exactly what evidence there is that Chen is a molded connector. Chen says that the string lights are molded inside the device, but it doesn't say that the connectors are molded. And you're absolutely right, Judge. Chen makes a distinction. Not Mr. Chen. The Chen reference makes a distinction between the lampstring device and the plurality of lampstring sets that are in there. That distinction is even set forth in the claim of the Chen reference. Why didn't you get a declaration from customers, from users, that established the nexus here? Your Honor, it's almost impossible to find customers because of the business structure that Prezov is in. This occurred a long, long time ago. Prezov is part of a little, basically a one-man shop. He sells goods, which he designs. He has them made in China. The goods are manufactured in China and drop shipped directly to Target and decode Walmart. So he never has an inventory. He never gets to see the customers. And he doesn't have old products lying around for me to get. Had I known that there was an issue with the quality of the evidence during the time the prosecution was open, I would have supplemented it. And even if you look at the very last entry in my appendix, you'll see that when the board sent this back to the examiner, the examiner chose not to reopen the prosecution. He deliberately went out of his way not to let me put in any more evidence. And it says that. Not in Sisyphus Veribus, but it says that in equivalent language. So the examiner basically said, I'm not even going to address your secondary consideration evidence while the prosecution is open. And after he sees what I've done with it on the appeal to the board, he says, oh, I'm going to invent a new paper that transmits the record to the board, and I'm going to dig in and criticize your secondary consideration evidence for the very first time. And then when it comes back to him, he says, I'm not going to reopen the record either. Now, I felt horribly prejudiced. Yes, maybe it was petitional. How many years have to go by before Mr. Prezel gets to apply his patent? It was blatantly wrong for the board and the examiner not to consider the secondary evidence in accordance with the law of this court and Graham v. Deere and other law courts. Thank you, Your Honor. All rise.